Deirdre O'Connor
(California Bar No. 169422)
deirdre@seamuslaw.com
Seamus Law, APC
21151 S. Western Ave.
Torrance, CA 90501
Telephone: (310) 780-4522

Nick Brustin*
(New York Bar No. 2844405)
nick@nsbcivilrights.com
Anna Benvenutti Hoffmann*
(New York Bar No. 4412011)
anna@nsbcivilrights.com
Sona R. Shah*
(New York Bar No. 2927242)
sona@nsbcivilrights.com
Neufeld Scheck & Brustin, LLP
99 Hudson Street, 8th Floor
New York, New York 10013
Telephone: (212) 965-9081
Facsimile: (212) 965-9084
*Pro hac vice applications
forthcoming

*Attorneys for Plaintiffs John Klene and Eduardo Dumbrique*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| JOHN KLENE and EDUARDO DUMBRIQUE,<br><br>                    Plaintiffs,<br><br>        vs. | Case No.: 22-CV-8318<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

DORAL RIGGS; REYNOLD
VERDUGO; FRANK MERRIMAN;
MICHAEL O'HARA, and MARCELLA
WINN,

                    Defendants.

# INTRODUCTION

1.      Plaintiffs John Klene and Eduardo Dumbrique each spent over 23 years wrongfully incarcerated for a crime that they did not commit: the 1997 drive-by shooting murder of Antonio Alarcon in Hawthorne, California.

2.      In 2021, Klene and Dumbrique were exonerated after a thorough investigation by the Los Angeles District Attorney's Office (LADA) concluded the evidence on which the prosecution was based was unreliable, and that Klene and Dumbrique had evidence to show their factual innocence. This included evidence demonstrating a man with a long history of violence and murder—Chad Landrum, who went by the gang moniker "Ghost"—was the true perpetrator.

3.      Ghost had been targeting Alarcon for weeks before he assassinated him outside a tire store the night of June 28, 1997. Ghost eventually gave a detailed sworn confession to the Alarcon murder and confirmed that Klene and Dumbrique—who at 18 and 15 years old at the time of the shooting were years younger than Ghost and had no close ties to him—had no involvement in the crime.

4.      Indeed, Klene and Dumbrique were nowhere near the shooting that night. They were at Klene's parents' home, miles away and in a different city watching the infamous Tyson–Holyfield fight—in which Tyson bit off a part of Holyfield's ear—with a number of witnesses.

5.      Nonetheless, when an obviously unreliable witness (Ghost's confederate Santo Alvarez, aka "Payaso") falsely suggested Klene and Dumbrique

were involved in the shooting, Defendant Los Angeles Sheriff's Department (LASD) officers took the opportunity to close the case. In the absence of true or reliable evidence implicating the teens, Defendants fabricated a case against them, causing them to be convicted of a crime they did not commit.

6.     The LASD officers used improper suggestion to get the eyewitness, Daniel Curiel, to identify Klene and Dumbrique as a passenger and the shooter, respectively, then fabricated that Curiel had made an independent, positive, and reliable identification. Defendants next fabricated that three separate witnesses identified a friend's car as the vehicle used in the shooting, which was also false. These fabrications became the cornerstones of the prosecution.

7.     When, before trial, Curiel signed a sworn statement truthfully explaining that he could not identify the shooter or the passenger, but that LASD officers directed him to make a particular identification and falsely recorded he did so by his own volition, Defendants acted to save the prosecution and hide their misconduct. They fabricated a report falsely claiming Curiel had recanted his identifications due to fear of gang retaliation.

8.     As Defendants focused on prosecuting innocent teens based on sham evidence, Ghost—the true killer—remained free to gruesomely murder a homeless man, Richard Daly, about three weeks following the Alarcon murder, assisted by Payaso.

9.     When the Los Angeles Police Department (LAPD) detective investigating the Daly murder, Marcella Winn, learned of Ghost and Payaso's involvement in that crime, she conspired with the LASD Defendants—who were using Payaso as a key witness against Klene and Dumbrique—to protect both prosecutions by manipulating evidence to erase Payaso from the narrative. As a result, not only were Klene and Dumbrique wrongly convicted of the Alarcon murder, but another innocent person, Susan Mellen, spent 17 years wrongly

imprisoned for the Daly murder before she was exonerated. Astonishingly, Winn caused at least three other proven wrongful convictions.

10.     Klene and Dumbrique—now exonerated and finally free—bring this lawsuit to hold those who illegally caused their wrongful conviction accountable.

## JURISDICTION AND VENUE

11.     This action is brought pursuant to 42 U.S.C. §§ 1983 et seq., and the Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is premised on 28 U.S.C. §§ 1331 and 1343(a)(1)-(a)(4), 28 U.S.C. § 1367, and the aforementioned statutory and Constitutional provisions.

12.     Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391(b) because the events, injuries, and violations of rights alleged herein occurred within the County of Los Angeles, California, which is within this district and because the Defendants, or some of them, reside within the jurisdictional boundaries of this Court.

## PARTIES

13.     Plaintiff **John Klene** is 44 years old and lives in Redondo Beach, California. Klene was wrongfully incarcerated from his arrest in 1997 until his release in 2021, and wrongfully convicted from his conviction in 1998 until his exoneration in 2021.

14.     Plaintiff **Eduardo Dumbrique** is 41 years old and lives in Redondo Beach, CA. Dumbrique was wrongfully incarcerated from his arrest in 1997 until his release in 2021, and wrongfully convicted from his conviction in 1998 until his exoneration in 2021.

15.     At all relevant times, Defendant **Doral Riggs** was employed by the Los Angeles Sheriff's Department (LASD), acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes,

ordinances, regulations, policies, customs, and usage of Los Angeles County and the State of California. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

16.     At all relevant times, Defendant **Reynold Verdugo** was employed by the LASD acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Los Angeles County and the State of California. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

17.     At all relevant times, Defendant **Frank Merriman** was employed by the LASD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Los Angeles County and the State of California. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

18.     At all relevant times, Defendant **Michael O'Hara** was employed by the LASD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Los Angeles County and the State of California. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

19.     At all relevant times, Defendant **Marcella Winn** was employed by the Los Angeles Police Department (LAPD), acting under color of law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Los Angeles and the State of California. She is sued in her individual capacity.

## FACTUAL ALLEGATIONS

**Stone-cold killer "Ghost" murders Antonio Alarcon in a drive-by shooting.**

20. On June 28th, 1997, Chad "Ghost" Landrum shot and killed Antonio Alarcon in a drive-by outside EMC Tire Company in Hawthorne, California. Ghost was known as a killer—indiscriminately flying into fits of rage and committing sadistic acts of violence; the Alarcon shooting is one of at least a dozen murders he committed.

21. Apart from his general inclination to homicidal rage and sadistic violence, Ghost had personal animus against Alarcon which motivated the murder. Ghost was also an active member of Lawndale 13, a neighborhood gang comprised of members from Lawndale, California and the surrounding area, while Alarcon was a leader of Lil' Watts, a rival gang based primarily in Hawthorne.

22. In the weeks leading up to the murder, Ghost had been stalking Alarcon, and had twice before attempted to shoot him before his plan was stymied.

23. On June 28th, 1997, around 11:00 pm, Alarcon was talking on a payphone outside EMC Tire Company when a dark sedan carrying Ghost approached the curb directly in front of him. Ghost opened the right rear passenger door, stepped out of the car, and in rapid succession fired twelve shots at Alarcon at point-blank range before retreating back into the car, which sped away. As he shot Alarcon, Ghost called Alarcon by his gang name, stating, "Fuck you, Puppet." Alarcon died within minutes.

24. Ghost would go on to commit additional murders. Just three weeks after killing Alarcon, Ghost savagely attacked a defenseless homeless man, Richard Daly; Ghost beat him to death with a claw hammer and dumped his body in an alley before setting him on fire.

**Plaintiffs are innocent of the Alarcon murder.**

25. John Klene and Eduardo Dumbrique had nothing to do with the murder of Antonio Alarcon; they were not present and had no involvement in it.

26.   The night of Alarcon's death, both Klene, then 18 years old, and Dumbrique, then 15 years old, were with a group of people at Klene's parents' house miles away in Lawndale, watching Mike Tyson fight Evander Holyfield. The match was a particularly memorable one; in the third round, Tyson partially bit off Holyfield's left ear—causing an early stoppage to a highly anticipated rematch between the two fighters.

27.   Both Klene and Dumbrique stayed at Klene's family home for the entirety of the fight as well as the abnormally long post-fight interviews.

28.   Klene never left his own house and fell asleep on his own couch sometime after midnight; Dumbrique did not leave until at least midnight— approximately an hour after Alarcon was shot and killed.

29.   A number of alibi witnesses corroborated Klene's and Dumbrique's whereabouts at Klene's family home before, during, and after the Tyson/Holyfield fight. A friend of Klene's mother called the home phone within minutes of the time of the shooting and spoke with Klene. A neighbor spoke to Klene out on Klene's driveway when he returned home from work minutes after the time of the shooting.

30.   Although, like many other young men in the Lawndale area, Klene and Dumbrique were also members of Lawndale 13, they were years younger than Ghost and ran in different circles than he did. Indeed, given Ghost's reputation of indiscriminate rage and violence, Klene and Dumbrique did their best to avoid him. In addition, by this time, Klene had already completed his first year of college and was enrolled in his second year to start that fall, already having begun to distance himself from Lawndale 13.

31.   Klene and Dumbrique had no involvement whatsoever in the shooting; did not see the real killer, Ghost, the night of the shooting, and were not even in Hawthorne that night.

32.   Ghost subsequently gave a detailed confession to the murder, including providing specific details about the crime, how it was committed, and his

motivation. He confessed repeatedly, including under oath, and volunteered to take a lie detector test. He consistently, and truthfully, averred Klene and Dumbrique had no involvement in the shooting and were not present for it.

33.    Klene and Dumbrique have consistently maintained their innocence for 25 years. After its thorough reinvestigation, LADA conceded that the evidence used to prosecute Klene and Dumbrique was not reliable and that they have each met their burdens to prove their factual innocence.

**Riggs investigates the Alarcon shooting for the LASD.**

34.    At 11:04 pm, on June 18, 1997, the Hawthorne Police Department received a 911 call from the scene of the Alarcon shooting. Paramedics arrived within minutes, and Alarcon was pronounced dead at 11:15 pm.

35.    Shortly thereafter Defendant Doral Riggs, an LASD detective, arrived on the scene. Riggs became the lead detective on the case, performing many investigative steps alongside now-deceased LASD detective, Officer Donald Garcia.

36.    Also, by the time Riggs and Garcia arrived, other officers had already identified seven potential witnesses. Defendant Riggs ordered five of these witnesses: Daniel Curiel, Medardo Alvarado, Marcela Gonzalez, Jose Gradilla, and Gustavo Lucero be taken to the Hawthorne Police Department where Riggs questioned them.

37.    Although a number of witnesses were at or near the scene when the shots started, they were unable to get a good enough look at the suspect vehicle to describe it in any significant detail due to the conditions at the scene, including that it was dark out with poor lighting, and many of the witnesses had obstructed or no views for much of the encounter. Still, each witness described the car as "dark" in color. None were able to give a detailed description of the suspect vehicle's occupants.

38.   Despite interviewing all seven witnesses, the victim's friends and family, and speaking with LASD Gang Detail officers, Defendants had very little to go on: the vague description of the suspect vehicle as a "dark" car given by witnesses at the scene of the crime and the suspicion Alarcon's murder was gang-related retaliation for a shooting in Lawndale the night before.

39.   With only a description of a relatively common vehicle, a vague description of the shooter, and the suspicion the shooting was gang-related, Defendants' investigation reached a dead-end.

**An informant looking for a deal proves a boon to officers looking to close the case.**

40.   Three days after the murder, Defendant Riggs capitalized on an opportunity to begin closing this case: an obviously unreliable statement from Santo "Payaso" Alvarez who was transparently attempting to deal his way out of jail time.

41.   Payaso was a drug-addicted member of Lawndale 13, where he was affiliated with Ghost and some of the older members of the gang. Payaso was older than Klene and Dumbrique and did not associate with the same crowd as they did.

42.   Immediately before speaking to LASD investigators, Payaso was arrested by Torrance Police Department officers for possession of drug paraphernalia and a dangerous weapon.

43.   After Payaso's arrest, Defendant Riggs interviewed Payaso about the Alarcon shooting.

44.   Payaso stated upfront that he was simply trying to talk his way out of jail; clearly Payaso was motivated to tell Riggs whatever he wanted to hear to do so. Payaso then concocted an entirely false story implicating two innocent teens in the Alarcon shooting: Klene and Dumbrique.

45.   Payaso's story was incredible on its face. He claimed that on the day of the shooting, while riding his bicycle on 163rd street in Lawndale, he just

happened to overhear a conversation among three Lawndale 13 members with whom he was not on good terms: Klene, Dumbrique, and Robert Caputo.

46. Payaso implausibly reported that at this exact time he was riding by, he heard the three saying they were upset about the shooting in Lawndale the night prior and that Klene was particularly upset because he was close friends with one of the victims—Luis Medrano.

47. According to Payaso, all while riding by, he also overheard the three men stating their intention to kill one, or some, Lil' Watts members that night. Payaso claimed the three made these threats in front of a crowd of 15 or 16 other people.

48. Continuing his incredible story, Payaso then claimed that he also happened to see the three teens together at several additional points during the day, including about three hours before the shooting, each time driving around in Caputo's green Ford Escort

49. In another outlandish coincidence, Payaso claimed to have again just happened to overhear yet another admission the following day. Payaso claimed as he was riding by on his bicycle on 163rd Street, he came upon the same three teens, again in the green Ford Escort, just as Klene was bragging about "blasting some fool" the night before.

50. Although Payaso did not claim that the teens had ever specifically linked themselves to Alarcon's murder, he told Riggs that after he heard about Alarcon's murder, he assumed that those three must have been involved.

51. As Riggs knew or should have known at the time, none of Payaso's story was true. Klene and Dumbrique had no involvement in Alarcon's murder (or any other shooting of any Lil' Watts member) and never told anyone they did.

52. Although Payaso was offering full cooperation in his attempt to deal himself out of jail, Riggs failed to follow up on basic information to attempt to corroborate Payaso's statement. For example, though Payaso claimed there were

15 or 16 other gang members around at the time he allegedly first overheard Klene, Dumbrique, and Caputo threatening to retaliate against Lil' Watts for the shooting of Medrano, Riggs never attempted to determine the identity of any of these other alleged witnesses, let alone interview them.

53.   Riggs also failed to investigate any of the other alleged suspects alluded to in Payaso's stories, even though Payaso told him that all his "homies" were talking about "going and getting" Lil' Watts members.

54.   Given the obvious credibility problems Payaso himself had (making him a questionable prosecution witness at best), there was no reasonable explanation for this failure—other than Riggs understood that Payaso's report was false and that further investigation would only demonstrate that.

55.   Similarly, the few other details Payaso provided in his statement were also demonstrably false. For example, Payaso repeatedly claimed he had seen Klene and Dumbrique driving around in Caputo's green Ford Escort all weekend. But as Riggs could have easily discovered by checking vehicle records, while Caputo *had* owned a green Ford Escort, he had traded it in months before; the green Ford Escort was as much a figment of Payaso's imagination as the rest of his account implicating Klene and Dumbrique. Riggs either learned this information about Caputo's Ford Escort was false and failed to report that or deliberately failed to take this easy investigative step because he knew or suspected Payaso's account would not hold up to any scrutiny.

56.   Similarly, Payaso falsely claimed that Klene was motivated to retaliate against Lil' Watts because of his close friendship with Luis Medrano— one of the men who had been badly injured in the Lawndale shooting the night before. In reality, there was no such relationship; Medrano did not know Klene or Dumbrique.

57.   Two days after taking Payaso's statement, Riggs and Garcia met with LASD Gang Detail detective Michael O'Hara—the officer responsible for

investigating Medrano's shooting. According to Riggs's report, they discussed the gang affiliations connecting the two cases, even though Riggs and O'Hara knew or should have known Medrano did not have gang affiliations and that Medrano did not know Klene or Dumbrique or vice versa.

58.   Despite being arrested for a felony, Payaso was released pursuant to an oral agreement within a couple of hours of implicating innocent men in a crime they did not commit. And although Payaso's false account was obviously unreliable, Riggs jumped at the newly offered suspects.

**Riggs and other officers fabricate a positive photo identification by witness Curiel.**

59.   Although Payaso's statement caused Defendants to pivot their entire investigation to innocent teens Klene and Dumbrique, it was insufficient on its own to support their prosecution. In addition to the conspicuous credibility problems with the source—Payaso was suffering from a drug addiction at the time; had a considerable criminal history by that point, including assault with a deadly weapon and vehicular theft; and would be released from custody on potential drug-paraphernalia possession and weapon-possession charges—the vague admissions Payaso claimed to have overheard did not directly link Klene and Dumbrique to the Alarcon murder. Payaso did not claim to be able to put the teens at the scene of the crime and no physical evidence implicated them. As Riggs recognized, more would be needed to move forward with a prosecution.

60.   On July 10, 1997, Riggs visited Daniel Curiel, the owner of EMC Tire Shop who police had interviewed the evening of the crime, to manufacture evidence implicating Klene and Dumbrique even though Curiel had not seen well enough to identify the shooter or passengers in the shooter's getaway car.

61.   Riggs had prepared three separate photo arrays each containing six mugshots. Contrary to procedure, each array contained multiple suspects. The first array contained three members of the Lawndale 13 gang. The second array

contained a photo of Dumbrique and at least two other Lawndale 13 members. The third array contained a photo of Klene and four other Lawndale 13 members, including two who were suspected possible drivers of the vehicle from which the gunshots were fired.

62.    Riggs and Garcia arrived at Curiel's workplace to show him these photo arrays. Curiel had told the officers who arrived at the scene that he was unable to get a good look at the suspects because of the gunfire. Examining the scene, the officers would have known that the building would have blocked Curiel's view from where he had been standing when the gunfire rang out, as he had his back to the street and moved toward the back of the garage when the shots first went off.

63.    Only Curiel, Riggs, and Garcia were present for the photo identification procedure. Although Riggs and Garcia had portable recording equipment and had already recorded interviews with multiple witnesses during the course of investigation, they did not record the identification procedure with Curiel. On information and belief, Riggs and Garcia intentionally failed to record this interaction so they could use improper suggestion and later misrepresent what occurred in their report.

64.    During the procedure, Riggs engaged in a campaign of suggestion designed to pressure Curiel into identifying Klene and Dumbrique.

65.    During the procedure, Riggs pointed out Klene's picture and told Curiel that Klene was the passenger in the shooter's car and to select him.

66.    Curiel had not seen the passengers in the car well enough to make an identification. And Curiel had not seen Klene at all, because Klene was not there. Nevertheless, Curiel wrote down that Klene was the passenger because Riggs instructed him to do so.

67.    As Curiel continued flipping through, Riggs stopped Curiel and said, "this guy looks familiar," even though Curiel had not recognized the photo of

Dumbrique. Riggs continued, "do you recognize this?" Curiel truthfully responded he did not recognize the photo of Dumbrique.

68.    Riggs insisted that Curiel write down that the photo of Dumbrique was the rear passenger who shot Alarcon. Riggs pointed at Dumbrique's photo and then falsely told Curiel that they had picked up Dumbrique and that he was bragging about having shot Alarcon.

69.    Curiel had not seen the shooter well enough to identify him. Indeed, the actual shooter—Ghost—looks nothing like Dumbrique; for one thing, Ghost is white and Dumbrique is Filipino with a darker complexion. Ghost was also 23 years old at the time, while Dumbrique was only 15. Nevertheless, Curiel followed Riggs's direction and wrote down that Dumbrique was the shooter.

70.    After improperly suggesting Curiel identify both Klene and Dumbrique, Riggs and Garcia told Curiel exactly what to write on the admonishment form—that Klene was the passenger in the right, front seat of the vehicle and that Dumbrique was the passenger in the right, rear seat who shot the gun out of the rear window of the vehicle.

71.    Riggs then fabricated a false report of Curiel's identification procedure. Instead of reporting the truth—that Curiel failed to make an identification because he did not see any suspects—Riggs falsely claimed Curiel positively and independently identified Klene and Dumbrique "without hesitation."

72.    Curiel wrote what Defendants instructed him to because he was eager to have the police exit his place of business.

**Riggs and other officers fabricate an identification of a car owned by a friend of Klene's and Dumbrique's as the shooter's getaway car.**

73.    On July 10, 1997, Riggs and Garcia directed local police officers to stop Dumbrique and Andrew Aparicio as they were driving around in Aparicio's light-green, four-door Honda.

74.     Although Payaso's initial statement implicated another man—Robert Caputo—as the driver of the shooter to and from the scene in his Ford Escort, Caputo had traded in his Escort months before this crime. Defendants then pivoted to a theory that Aparicio drove the shooter in his light-green Honda, even though all the reports gathered by police indicated that the getaway car was dark in color and Aparicio's car was light.

75.     Riggs then reported that he brought a photo of Aparicio's car to show to three of the witnesses to the shooting: Curiel, Alvarado, and Gradilla. Riggs falsely reported that each of the three of them affirmatively identified Aparicio's car as the one used to bring the shooter to and from the scene of the crime.

76.     Riggs reported that Curiel "looked at the photographs of the vehicle and stated it was the vehicle he observed in front of his business" on the night Alarcon was shot.

77.     This was false; Curiel never made such an identification of Aparicio's car. Instead, *Riggs* told *Curiel* that Aparicio's car was the one used as part of the crime when showing Curiel the photos. Curiel had not seen the car clearly enough to identify it. And Aparicio's light-green car was *not* used in the shooting; instead, it was parked miles away, in another town in Klene's driveway from around 5 pm to midnight while Aparicio watched the fight and related post-coverage. Curiel had also described the car as a dark sedan, whereas Aparicio's car was light green and thus did not match that description.

78.     Similarly, Riggs falsely reported that Alvarado identified Aparicio's car "without a doubt" as the vehicle used and that Gradilla agreed Aparicio's car looked like the same type as that used in the shooting. In reality, none of the witnesses positively identified Aparicio's car, which was not the car used in the shooting and did not particularly look like the car used. Riggs's report of these positive identifications of the car used were all fabrications.

79.    On the same day, Riggs and Garcia showed Alvarado and Gradilla the photo of the suspected getaway car, they also showed them the same three six-person photo arrays shown to Curiel. Neither Alvarado nor Gradilla made an identification from these photo arrays.

80.    Based on the suggestive photo identification procedure conducted with Curiel, and the fabricated identification of the getaway car by Curiel, Alvarado, and Gradilla, Klene and Dumbrique were charged with murder. **Desperate to rely on Payaso as the star witness, Riggs and Garcia conspire with Winn to protect him from a charge of murder in another crime.**

81.    On July 21, 1997, Payaso—together with Ghost and another member of the older Lawndale 13 crew they hung out with, Wicked—participated in a brutal murder of a homeless man, Richard Daly.

82.    Rumors of their involvement began to surface, and the Los Angeles Police Department (LAPD) investigated the three as suspects. Marcella Winn of the LAPD was the main investigator of this homicide. By August 5, 1997, Winn learned from an informant that Payaso, Ghost, and Wicked had beaten the victim to death.

83.    Shortly thereafter, Riggs and Winn had phone conversations. Riggs learned from Winn that Payaso was a suspect in this July 21 murder along with Ghost and Wicked.

84.    Although the information Riggs learned from Winn further undermined any possible reliability or credibility of Payaso's statement implicating Klene and Dumbrique in the Alarcon shooting, Riggs made no record of the information he learned from Winn.

85.    Instead, Riggs informed Winn that Payaso was a key witness in the Alarcon murder investigation.

86.    Riggs and Winn then reached an agreement to protect the success of both their prosecutions; they would downplay Payaso's role in the Daly murder in an attempt to preserve him as a witness in the Alarcon shooting.

87.    Winn and Riggs knew that the Daly murder occurred in Lawndale, which is outside LAPD's jurisdiction. Both knew that based on jurisdiction and superior institutional knowledge, LASD should have assumed responsibility for the Daly investigation. LASD's trained gang detectives were better equipped to investigate a gang-related homicide involving Payaso, Ghost, and Wicked, all from Lawndale 13—a gang actively monitored by LASD. Disregarding the jurisdictional boundaries and each agency's established requirements to seek high-level approval before deviating from jurisdictional boundaries, Winn and Riggs agreed that Winn should keep the case to facilitate their plan regarding Payaso.

88.    Shortly after her conversation with Riggs, Winn pivoted her investigation of the Daly murder away from Payaso, instead pinning the killing on an innocent woman, Susan Mellen. This scheme resulted in two major miscarriages of justice: the resulting wrongful convictions of Klene and Dumbrique based on Payaso's false testimony, and the wrongful conviction of Susan Mellen for the Daly murder after the LAPD stopped pursuing Payaso as a suspect.

**Riggs learns that the motive Payaso invented for the shooting was false, but suppressed that evidence.**

89.    After pressuring Curiel into making false identifications that comported with Payaso's completely unreliable and verifiably false statement—and after Riggs and Winn had reached their agreement to protect the Alarcon and Daly prosecutions—Riggs interviewed Luis Medrano.

90.    Medrano was an innocent victim of a shooting in Lawndale that took place the night before Alarcon's shooting. Medrano was seriously injured, spending over two months in the hospital. Medrano cooperated with LASD detectives during all interviews that took place during and after his hospitalization.

91.     According to Payaso's false account, Klene's close friendship with Medrano motivated Klene to look for Lil' Watts members to kill the following day.

92.     However, when detectives asked Medrano point-blank if he knew Klene or Dumbrique, Medrano truthfully told police he neither knew, nor was friends with, either of them.

93.     Defendants Riggs and Garcia, and, on information and belief, Defendant O'Hara were the detectives who interviewed Medrano about his relationship with Klene in an attempt to corroborate Payaso's otherwise questionable statement. When Medrano told the truth—that he did not know Klene or Dumbrique—none of the Defendants documented either the fact or the substance of their interview with Medrano, and did not disclose this interview or its substance to either the prosecution or defense. Instead, Defendants continued to rely on Payaso's statement, which they knew to be false.

94.     Without this critical impeachment evidence, the prosecution was able to rely on Payaso's statement to provide otherwise innocent and uninvolved men with a purported specific and personal motivation to kill Alarcon. In reality, not only did Medrano not know the teens, but Klene did not even learn of the Medrano shooting until after he learned of the Alarcon murder.

**Curiel chooses Klene from a live lineup.**

95.     In October 1997, Curiel and Medardo Alvarado were brought to the Los Angeles County Jail for a line-up identification procedure.

96.     Prior to the procedure, Defendant Riggs informed Curiel and Alvarado they would be identifying the passenger in the suspect vehicle the night of the crime.

97.     Curiel then selected Klene—the person Riggs had directed him to select from the photo array. Alvarado did not identify anyone from the lineup.

**Riggs and Verdugo attempt to intimidate Curiel into testifying consistently with the fabricated statements Riggs and Garcia previously attributed to him.**

98.    On July 31, 1998, a private defense investigator interviewed Curiel and inquired about the circumstances of the photo identification procedure. During the interview, Curiel truthfully recounted that he had never identified Dumbrique or Klene, that he could not do so, and that he had merely written what Riggs told him to on the photo array and signed at Riggs's direction.

99.    Curiel willingly signed an affidavit attesting to those facts, which defense attorneys provided to prosecutor.

100.   The repeated statements from the sole purported identifying eyewitness that he had not and could not have identified anyone involved in the crime should have ended the case against Klene and Dumbrique. Furthermore, Curiel's detailed description of Riggs's misconduct, as a disinterested third-party witness, should have led to the discipline of Riggs and to the thorough discreditation of the investigation he led.

101.   In particular, Defendant Frank Merriman, who was directly supervising Riggs at this point, should have ensured based on this explicit, credible notice of Riggs's serious misconduct in the Alarcon investigation that both there was an independent investigation into Riggs's reported misconduct and that there was an independent review of the entire Alarcon investigation.

102.   Instead, Defendants Riggs and Verdugo, under the supervision and direction of Defendant Merriman, did the opposite: they attempted to fix the issue and save the prosecution.

103.   First, Riggs called Curiel at home, expressed his displeasure about Curiel's signed statement to the defense investigator, and suggested to Curiel that he had been pressured. Curiel unequivocally denied that was the case.

104.   Nevertheless, shortly thereafter Riggs and Verdugo made an unannounced visit to Curiel's place of employment. Despite Curiel's report of Riggs's misconduct, Riggs attended the visit, made his presence known to Curiel, and remained at Curiel's workplace throughout the interview. Riggs's personal

presence, immediately following his phone call to Curiel, was intended to intimidate Curiel into disavowing his sworn statement to the defense investigator.

105.  Defendants interrogated Curiel in a way they had never interrogated Payaso. When Curiel nevertheless made clear that his sworn statement was the truth—he could not identify the shooter and passenger, and that Riggs had engaged in direct suggestion—Riggs and Verdugo fabricated that Curiel was recanting out of fear of gang retaliation. As Riggs and Verdugo knew, this was not true: Curiel never expressed any fear of gang retaliation and affirmatively denied that he was afraid or intimidated. Furthermore, Riggs knew that Curiel was not "recanting" at all—he had consistently expressed that he could not identify the shooter or passenger and never made any bona fide identification of Klene or Dumbrique, he merely acceded to Riggs's direct suggestion.

106.  In their report of the visit—not written until three months after the fact—Defendants Riggs and Verdugo continued Riggs's earlier fabrication that Curiel felt he was in danger of gang retaliation for his involvement as a witness and that he had already suffered from threats.

107.  Defendants knew re-interrogating Curiel was critical to the integrity of Riggs's case against Klene and Dumbrique. Defendants also had the ability to create, and subsequently preserve, a contemporaneous record of this critical encounter. They intentionally did not.

108.  Defendant Merriman, a Lieutenant with the LASD, approved both versions of the falsified report. On information and belief, Merriman knew the report was false.

**Besides Payaso's far-fetched, verifiably false version of events, the only evidence at trial was fabricated.**

109.  The case presented against Klene and Dumbrique at trial was incredibly weak. No physical or forensic evidence linked them to the crime. Nor did any witness testify at the trial to identify either Klene or Dumbrique as

participants in the crime. Indeed, seven alibi witnesses testified that both Klene and Dumbrique were nowhere near the scene of the crime at the time it was committed. Instead, both Klene and Dumbrique were at Klene's house watching the Tyson-Holyfield boxing match on TV. The only incriminating evidence—such as it was—was a direct result of Defendants' misconduct.

110. Curiel truthfully testified he had not and could not identify Klene or Dumbrique. However, the prosecution entered into evidence Riggs's fabricated identification forms and corresponding photo arrays to falsely suggest Curiel had identified Klene and Dumbrique. This fabricated evidence was the foundation of the prosecution's case.

111. To explain away Curiel's testimony that he had not and could not identify Klene or Dumbrique, the prosecution relied on fabricated evidence from Defendants Verdugo and Riggs that Curiel had recanted due to fear of gang retaliation should he identify either Klene or Dumbrique. In reality, Curiel had no such fear and had never expressed to Defendants that he did.

112. For his part, when called to testify, Payaso—the first witness to implicate Klene and Dumbrique—denied having a recollection of any relevant knowledge. The prosecution then played a tape recording of the incredible statement Riggs had taken from Payaso live for the jury. Payaso's taped statement was a farce and, at the time it was given, Payaso was only trying to talk his way out of jail time for an unrelated arrest. In closing, the prosecution argued there was no evidence rebutting this taped statement and that the jury could rely on it as evidence of Klene and Dumbrique's motive and intent to commit the shooting.

113. By the time of trial, however, Defendant Riggs knew, but did not disclose, a key piece of evidence rebutting Payaso's facially incredible statement. Payaso claimed Klene had perpetrated the Alarcon shooting in retaliation for the shooting of Medrano, who was supposedly a close friend of his. But Medrano reported to Defendants Riggs and O'Hara that he did not know either Klene or

Dumbrique. Had the substance of Medrano's statements to Riggs and O'Hara been provided to defense, they would have called Medrano as a witness to rebut the prosecution's only proffered evidence of motive and further demonstrate the complete unreliability of Payaso's proffered statement.

**Klene and Dumbrique were both wrongfully convicted.**

114.  Based on this fabricated evidence and without knowing of Defendants' misconduct in the investigation or Medrano's exculpatory statement, the jury convicted Klene and Dumbrique of first-degree murder.

115.  Klene was sentenced to life in prison without parole, and Dumbrique was sentenced to a term of 29 years to life in prison without parole.

**After each spending over two decades in prison, Klene and Dumbrique are finally exonerated.**

116.  For two decades both Klene and Dumbrique struggled to vindicate their innocence, filing pro se habeas petitions and writing to various lawyers and nonprofit groups seeking help to establish the truth of their innocence. When news of Ghost's renewed desire to confess resurfaced in 2012, John Klene's family and friends redoubled their efforts and was able located a new nonprofit, Innocence Matters. Klene's family persuaded Innocence Matters to look into Klene's and Dumbrique's claims of innocence.

117.  The organization actively investigated the case throughout the summer of 2012 and unearthed compelling evidence of innocence.

118.   In October 2012, Innocence Matters filed a habeas petition documenting the case for innocence for both Klene and Dumbrique. Among other things, the habeas petition was prompted by the fact that Ghost prepared a sworn declaration confessing to the Alarcon killing in March 2012.

119.  This was not Ghost's first attempt to confess. Before their 1998 criminal trial, Klene and Dumbrique's trial lawyers learned Ghost was prepared to take the stand and acknowledge his role in Alarcon's murder. Ghost, in custody on

another charge, was brought to the Los Angeles County Superior Courthouse to be questioned. While there, he got into a fight with another inmate in his holding cell, stabbing the shackled inmate multiple times. After the fight, Klene and Dumbrique's lawyers were unable to interview Ghost.

120.   In his 2012 confession, Ghost admitted that he committed the murder, and that Klene and Dumbrique were not involved. Before he died in prison, he testified under oath in 2013 admitting the same.

121.   In 2020, the Superior Court finally ordered the DA's office to reply to the habeas petition. The LADA conducted a reinvestigation of the evidence available at trial and post-trial, and conceded that Klene and Dumbrique met their burdens to prove their factual innocence.

122.   In particular, the LADA concluded that the two key pieces of evidence offered against Klene and Dumbrique: Payaso's statement to the police and the reported identifications by Curiel—were unreliable and could not be presented in good faith in support of a prosecution. After reviewing Payaso's ever-changing account of events during multiple interviews and history of criminal misconduct—including his involvement with Ghost in the Daly murder—the LADA concluded Payaso was entirely incredible and untrustworthy. In contrast, the LADA noted that Curiel consistently and specifically described the suggestive tactics Riggs used to get him to select photos of Klene and Dumbrique. The LADA additionally found that substantial evidence implicated Ghost, including a motive. The LADA also found that the motive attributed to Klene and Dumbrique at the time of their trial—retribution for shooting of allegedly close friend Luis Medrano—had been refuted.

123.   On February 19, 2021, the Superior Court of California vacated Klene's murder charges and dismissed the charges against him. On March 19, 2021, the Superior Court of California likewise vacated Dumbrique's murder charges and dismissed the charges against him.

## DAMAGES

124.  Plaintiff Klene served 8,591 days—more than twenty-three years of his life—incarcerated for a crime he did not commit. His incarceration began when he was nineteen years old and a sophomore attending El Camino College.

125.  As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, or deliberately indifferent acts and omissions, Klene sustained injuries and damages, which continue to date and will continue into the future, including: loss of freedom for more than twenty-three years; physical pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of property; legal expenses; loss of income and career opportunities; humiliation, indignities, and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled to monetary relief.

126.  Plaintiff Dumbrique served 8,654 days—more than twenty-three years of his life—incarcerated for a crime he did not commit. His incarceration began when he was just fifteen years old. He was sixteen at the time of trial, and tried as an adult.

127.  As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, or deliberately indifferent acts and omissions, Dumbrique sustained injuries and damages, which continue to date and will continue into the future, including: loss of freedom for more than twenty-three years; physical pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of property; legal expenses; loss of income and career opportunities; humiliation, indignities, and embarrassment; degradation; permanent loss of natural psychological development; and restrictions

on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled to monetary relief.

## CLAIMS

### Count I: 42 U.S.C. § 1983 Deprivation of Liberty Without Due Process of Law and Denial of a Fair Trial

*Against Defendants Riggs, Verdugo, O'Hara, and Merriman*

128.  Plaintiffs hereby incorporate each of the allegations in paragraphs 1 through 127 as if fully set forth herein, and further alleges as follows:

129.  Defendants fabricated false evidence of Klene's and Dumbrique's guilt, thereby violating their right to a fair trial and causing them to be deprived of their liberty without due process of law. Defendants caused this false evidence to be used against Klene and Dumbrique in their prosecution and at trial.

130.  For example, Riggs fabricated written documents falsely asserting that Curiel had made a bona fide identification of Dumbrique as the shooter and Klene as a passenger in the shooter's vehicle, when—as Defendant Riggs knew—Curiel had not and could not make such identifications. Additionally, Defendant Riggs also created written reports falsely recounting that witnesses Curiel, Alvarado, and Gradilla, had each identified a photo of a light green car owned by Aparicio as the getaway car, when in reality none had done so. And Defendants Riggs and Verdugo, together with Merriman and under his supervision, fabricated a written report falsely claiming that Curiel was afraid of gang retaliation, to explain why he would not identify Klene or Dumbrique, when Defendants knew that was not true.

131.  Defendants also obtained false and fabricated eyewitness identifications through suggestion, coercion, or other improper means. In particular, Riggs used improper suggestion and other improper means to cause Curiel to select Klene and Dumbrique from photos and Klene from a line up.

132.  Defendants also deprived Klene and Dumbrique of their right to a fair trial by withholding material exculpatory and impeachment evidence from prosecutors and the defense in violation of the Constitution and *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny.

133.  For example, Defendants Riggs and O'Hara suppressed evidence demonstrating the unreliability of Payaso's account, including that Medrano was not a gang member and also that he had told police that he did not know Klene or Dumbrique. In addition, all Defendants suppressed evidence of their misconduct, including the improper investigative tactics and the unlawful conspiracy with Winn.

134.  The criminal case against Plaintiffs was weak, and the only evidence against them was the foregoing false evidence fabricated by Defendants. Had the exculpatory evidence been disclosed, it would have cast doubt on the only evidence presented as to Klene's and Dumbrique's guilt, would have been used at trial to impeach Defendants and other witnesses, and would have demonstrated the invalidity of Defendants' entire investigation. Defendants' actions, individually and cumulatively, played a direct and decisive role in the jury's guilty verdict and were highly prejudicial to Klene's and Dumbrique's defenses. In consequence, without the false evidence that Defendants fabricated, or had the exculpatory evidence been disclosed, Klene's and Dumbrique's trial would most likely have had a different result.

135.  The foregoing acts and omissions were deliberate, reckless, wanton, cruel, motivated by evil motive or intent, done in bad faith, or involved callous indifference to Klene's and Dumbrique's federally protected constitutional rights. These acts were perpetrated while Defendants were acting in their capacities as employees or agents of the County of Los Angeles and under color of state law. No reasonable officer would have believed this conduct was lawful in 1997 or 1998.

136.  As a direct and proximate result of Defendants' actions, Klene and Dumbrique were each wrongly arrested, detained, and charged with murder; prosecuted, convicted, and sentenced to life without parole (Klene) and 29 years to life in prison without parole (Dumbrique); incarcerated for more than 23 years; and suffered the other grievous injuries and damages set forth above.

## Count II: 42 U.S.C. § 1983 Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments

*Against Defendants Riggs, Verdugo, and Merriman*

137.  Plaintiffs hereby incorporate each of the allegations in paragraphs 1 through 127 as if fully set forth herein, and further alleges as follows:

138.  Defendants Riggs caused criminal proceedings to be brought against Klene and Dumbrique without probable cause and without any reasonable belief in guilt. Klene and Dumbrique are completely innocent of the Alarcon murder. As Defendants knew, the sole basis for the criminal action against Klene and Dumbrique was the far-fetched statement by Payaso—which they soon learned was completely false—in exchange for being let off the hook for an arrest for the possession of weapons and drugs and the fabricated photo identifications of the Plaintiffs by Curiel and of the getaway car by Curiel, Alvarado, and Gradilla.

139.  Defendant Verdugo, by re-interviewing Curiel and writing a report that fabricated a motive supposedly explaining away Curiel's recantation, caused the baseless criminal proceedings to continue against Klene and Dumbrique in violation of their constitutional rights.

140.  Similarly, Defendant Merriman, by signing off Verdugo's report fabricating a motive purporting to explain away Curiel's recantation, caused the baseless criminal proceedings to continue against Klene and Dumbrique in violation of their constitutional rights.

141.  No reasonable officer in 1997 or 1998 would have believed that fabricated evidence provided probable cause to arrest, and no reasonable officer in

1997 or 1998 would have believed that an arrest without probable cause was justified.

142.   Defendants continued the prosecution against Klene and Dumbrique on the basis of this false and fabricated inculpatory evidence and suppressed material exculpatory evidence, thereby subjecting them to an ongoing seizure in violation of the Fourth and Fourteenth Amendments.

143.   The criminal proceedings against Klene and Dumbrique were initiated with malice. Defendants Riggs caused the charges against Klene and Dumbrique to be filed— and Verdugo and Defendant Merriman caused them to be continued— by knowingly providing the prosecution misinformation, concealing exculpatory evidence, and otherwise engaging in wrongful and bad faith conduct that caused the initiation of the legal proceedings against Klene and Dumbrique when they knew there was no probable cause.

144.   Defendants initiated the action against Klene and Dumbrique for the purpose of denying their constitutional rights, including their right to be free from unreasonable searches and seizures and their right not to be deprived of liberty without due process of law.

145.   As a direct and proximate result of Defendants' actions, Klene and Dumbrique were wrongly arrested, detained, and charged with murder; prosecuted, convicted, and sentenced to life without parole in prison (Klene) and 29 years to life in prison without parole (Dumbrique); incarcerated for more than twenty years; and suffered the other grievous injuries and damages set forth above.

146.   The criminal proceedings against Klene and Dumbrique terminated in their favor. The prosecution conceded their innocence and moved to vacate their convictions and dismiss their indictments. In February and March of 2021, the State of California recognized Klene's and Dumbrique's innocence, respectively, and granted their habeas petitions.

## Count III: 42 U.S.C. § 1983 Civil Rights Conspiracy

*Against Defendants Riggs, Verdugo, Winn, O'Hara and Merriman*

147.  Plaintiffs hereby incorporate each of the allegations in paragraphs 1 through 127 as if fully set forth herein, and further alleges as follows:

148.  Defendants Riggs, Verdugo, Winn, O'Hara and Merriman agreed among themselves, and with others, to act in concert to deprive Klene and Dumbrique of their clearly established constitutional rights as protected by the Fourth and Fourteenth Amendments, including their right not to be deprived of liberty without due process of law and to be free from illegal seizure.

149.  As described in detail above, in furtherance of the conspiracy, Defendants Riggs, Verdugo, Winn, O'Hara and Merriman, and others, including Officer Garcia, engaged in and facilitated numerous overt acts in furtherance of the conspiracy, including but not limited to, the following misconduct:

a.   Defendants Riggs together with Officer Garcia, acted in concert to fabricate sham photo identifications of Klene and Dumbrique by witness Curiel;

b.   Defendant Riggs, together with Officer Garcia, acted in concert to fabricate sham getaway car identifications by witnesses Curiel, Alvarado, and Gradilla;

c.   Defendants Riggs and Winn acted in concert to downplay evidence undermining the reliability of Payaso's statement implicating Klene and Dumbrique;

d.   Defendants Riggs and O'Hara, together with Officer Garcia and Payaso, acted in concert to suppress evidence undermining the sham motivation Payaso attributed to Klene for the murder of Alarcon; and

e.   Defendants Riggs, Verdugo, and Merriman acted in concert to bolster the coerced and fabricated identifications made by Curiel even after he recanted these identifications, by reiterating in a report that Curiel admitted to making these

identifications and that the reason he previously recanted these identifications was because he was threatened by gang members—an untrue statement.

150.  No reasonable officer in 1997 or 1998 would have believed this conduct was lawful. As a direct and proximate result of Defendants' actions, Klene and Dumbrique were wrongly arrested, detained, and charged with murder; prosecuted, convicted, and sentenced to life without parole in prison (Klene) and 29 years to life in prison without parole (Dumbrique); incarcerated for more than twenty years; and suffered the other grievous injuries and damages set forth above.

### Count IV: 42 U.S.C. § 1983 Failure to Intervene

*Against Defendants Merriman, Verdugo, and O'Hara*

151.  Plaintiffs hereby incorporate each of the allegations in paragraphs 1 through 127 as if fully set forth herein, and further alleges as follows:

152.  By their conduct and under color of state law, Defendants, acting within the scope of their employment, had opportunities to intervene on behalf of Klene and Dumbrique to prevent his malicious prosecution and deprivation of liberty without due process of law, but with deliberate indifference, declined to do so. No reasonable officer in 1997 or 1998 would have believed this conduct was lawful.

153.  Defendant Merriman's failures included, but are not limited to:

a.     Failing to intervene to prevent or stop Riggs's, Garcia's, and Verdugo's further misconduct once he learned of Curiel's allegations of suggestion and coercion by Riggs during the photo procedures;

b.     Failing to intervene to prevent or stop the fabrication by Riggs and Verdugo of statements by Curiel that he was threatened by gangs and reports memorializing these fabrications;

154.  Defendant Verdugo's failures included, but are not limited to:

a.      Failing to intervene to prevent or stop Riggs's further misconduct once he learned of Curiel's allegations of suggestion and coercion by Riggs during the photo procedures;

b.      Failing to intervene to prevent or stop the fabrication by Riggs of statements by Curiel that he was threatened by gangs and reports memorializing these fabrications;

155.  Defendant O'Hara's failure included, but is not limited to:

a.      Failing to intervene to prevent or stop the concealment and suppression of exculpatory evidence, such as the information provided by Medrano, undermining Payaso's sham statement.

156.  These Defendants' failures to intervene violated Klene's and Dumbrique's clearly established constitutional right not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments. No reasonable officer in 1997 or 1998 would have believed that failing to intervene to prevent Defendants from fabricating inculpatory evidence, concealing and withholding exculpatory evidence, or causing Klene and Dumbrique to be arrested and prosecuted without probable cause, were lawful.

157.  These Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Klene's and Dumbrique's injuries. Defendants knew, or should have known, that their conduct would result in Klene's and Dumbrique's wrongful arrests, prosecutions, convictions, and incarcerations.

158.  As a direct and proximate result of Defendants' failure to intervene, Klene and Dumbrique were wrongly arrested, detained, and charged with murder; prosecuted, convicted, and sentenced to life without parole in prison (Klene) and 29 years to life in prison without parole (Dumbrique); incarcerated for more than twenty years; and suffered the other grievous injuries and damages set forth above.

## Count V: 42 U.S.C. § 1983 Supervisory Liability Claim

### *Against Lieutenant Merriman*

159.  Plaintiffs hereby incorporate each of the allegations in paragraphs 1 through 127 as if fully set forth herein, and further allege as follows:

160.  Klene and Dumbrique's wrongful prosecutions, trials, convictions, and incarcerations were caused by the unconstitutional action and inaction by LASD supervisor Merriman acting in his individual capacity and under color of law.

161.  Defendant Merriman knowingly refused to terminate the wrongful prosecution of Klene and Dumbrique, which he knew or should have known had been initiated based on the coerced, fabricated, or suggested identifications and false and fabricated evidence. As a result, Defendant Merriman knew or reasonably should have known that Klene and Dumbrique's constitutional rights to be free from unreasonable seizure and not to be deprived of liberty without due process of law would be violated.

162.  Defendant Merriman culpably failed to adequately supervise, control and/or train his subordinates, including Riggs and Verdugo, who fabricated and/or suggested identifications and suppressed exculpatory information.

163.  Defendant Merriman violated Klene and Dumbrique's constitutional rights by acquiescing in the deprivation of their constitutional rights by his subordinates, and by showing a reckless and callous indifference to their rights.

164.  Defendant Merriman's failure to supervise, control, and/or train his subordinates, his indifference to the actions of his subordinates, and his indifference to Klene and Dumbrique's rights, encouraged and permitted his subordinates to fabricate inculpatory evidence and to fail to document and to disclose exculpatory evidence.

165.  The actions and omissions of Defendant Merriman in his individual capacity, caused Klene and Dumbrique to be wrongly prosecuted, convicted, and

sentenced to life without parole in prison (Klene) and 29 years to life in prison without parole (Dumbrique); incarcerated for more than twenty years; and suffered the other grievous injuries and damages set forth above.

166.  Because of Merriman's failure to supervise, control, discipline, and/or train Riggs, Klene and Dumbrique were deprived of their clearly established rights under the Fourth and Fourteenth Amendments. No reasonable officer in 1998 would have believed this conduct was lawful.

## JURY DEMAND

167.  Pursuant to the Seventh Amendment of the United States Constitution, Klene and Dumbrique request a jury trial on all issues and claims set forth in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Klene and Dumbrique demand judgment jointly and severally against Defendants as follows:

A.    That the Court award compensatory damages to them and against the Defendants, jointly and severally, in an amount to be determined at trial but that exceeds the jurisdictional limits of all lower courts that would otherwise have jurisdiction over this action;

B.    That the Court award punitive damages to them, and against all individual Defendants, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

C.    For a trial by jury;

D.    For pre-judgment and post-judgment interest and recovery of their costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E.    For any and all other relief to which they may be entitled.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

Dated: November 14, 2022

SEAMUS LAW, APC

By: ___/s/ Deirdre O'Connor___
        Deirdre O'Connor

        *Lead Counsel for John Klene*

NEUFELD SCHECK & BRUSTIN LLP

        Nick Brustin*
        Anna Benvenutti Hoffmann*
        Sona R. Shah*

        *Lead Counsel for Eduardo
        Dumbrique*

        **Pro hac vice* applications
        forthcoming

COMPLAINT AND JURY DEMAND
34